UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
NEW YORK
------------------------------------------------------
NEW YORK METRO PETERBILT,
INC., BARCLAY EHRLER

               Plaintiffs,

     -against-

PETERBILT MOTORS COMPANY,
PETERBILT OF NEW YORK CITY, LLC,
MAURICIO LEAL,

               Defendants.
------------------------------------------------------X

**MEMORANDUM AND ORDER**
13-CV-843 (DRH)(GRB)

**A P P E A R A N C E S :**

**For the Plaintiffs:**
**PINKS, ARBEIT & NEMETH, ESQS.**
140 Fell Court, Suite 303
Hauppauge, NY 11788
By:   Steven G. Pinks, Esq.
      Jonathan W. Lipshie, Esq.

**For the Defendant Peterbilt Motors Company:**
**PISCIOTTI, MALSCH & BUCKLEY, P.C.**
445 Hamilton Ave., Suite 1102
White Plains, NY 10601
By:   Anthony M. Pisciotti, Esq.
      Jeffrey Martin Malsch

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
3600 Maclay Blvd. South, Sutie 202
Tallahassee, FL 32312
By:   James A. Bertron, Esq.
      Dean Bunch, Esq.

**For the Defendants Peterbilt of New York City, LLC and Mauricio Leal**
**VISCI & ASSOCIATES, PC**
8302 13th Ave.
Brooklyn, NY 11228
By:   Donna M. Alkin, Esq.
      Joseph J.J. Visci, Esq.

**HURLEY, Senior District Judge:**

Plaintiffs New York Metro Peterbilt, Inc. ("NY Metro") and Barclay Ehrler ("Ehrler") (collectively "plaintiffs") commenced this action against defendants Peterbilt Motors Company ("Peterbilt"), Peterbilt of New York City, LLC ("Peterbilt of NYC") and Mauricio Leal ("Leal") (collectively "defendants") asserting state claims of breach of contract, misrepresentation, and fraud in Suffolk County Supreme Court. On February 14, 2013, the action was removed to this Court. Presently before the Court is defendant Peterbilt's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") seeking dismissal of plaintiffs' breach of contract and fraud claims as well as the Rule 56 motion of Peterbilt of NYC and Leal (collectively "Leal defendants") seeking dismissal of each of plaintiffs' claims. Additionally, plaintiffs move for summary judgment on Leal defendants' counterclaims for franchise infringement, fraudulent misrepresentation, and bad faith. For the reasons set forth below, Peterbilt's motion is granted in part and denied in part, Leal defendants' motion is granted in part and denied in part, and plaintiffs' motion is granted.

## BACKGROUND

The following facts, drawn from the parties' Local Rule 56.1 statement and submissions, are undisputed unless otherwise noted.

Peterbilt manufactures medium and heavy duty trucks for retail sale through a network of independently owned and authorized dealers. In October of 2009, Peterbilt and NY Metro entered into a "Dealer Sales and Service Agreement" (Pls.' Ex. A to Opp'n to Leal Defs.' Mot. for Summ. J. ("the Dealership Agreement")) through which Peterbilt granted NY Metro "a nonexclusive right to buy [Peterbilt] products . . . [and] to identify itself as an authorized

Peterbilt dealer." (*Id*. at I.B.)[1]  The agreement specified that NY Metro was authorized to sell new trucks, truck parts and provide truck services at a Flushing location and was authorized to sell truck parts and perform truck servicing at a Hauppauge location.  Ehrler, NY Metro's President and majority owner, signed the agreement on behalf of NY Metro.  The Dealership Agreement provided that any transfer of ownership of the dealership required Peterbilt approval.  Although the Dealership Agreement was set to expire on May 20, 2011, Peterbilt extended the agreement a number of times until January 31, 2012.

On March 2, 2011, Ehrler notified Peterbilt in writing that "it no longer ma[de] sense for [him] to continue to operate" at the Flushing location and proposed consolidating operations at Hauppauge, including "mov[ing] all truck sales from the Flushing dealership to the Hauppauge dealership."  (Leal Defs.' R. 56.1 Stmt. ¶ 9.)  Subsequently, Ehrler spoke with Michael Conroy ("Conroy"), a Peterbilt representative, about a potential sale of the NY Metro dealership.  In particular, Ehrler received an email from Conroy dated June 21, 2011 that attached a sample Asset Purchase Agreement ("APA") and stated, "I believe this would be a good starting point to begin the process of asset purchase."  (*Id*. ¶ 12.)

In July of 2011, Ehrler met with Leal[2], who at that time was the Northeast Regional Manager of Peterbilt, to discuss a possible sale of NY Metro to Leal as well as the possibility for Leal's lease of the Hauppauge location.  Plaintiffs state that at this meeting Leal told Ehrler that he would purchase all of NY Metro's assets, including its Peterbilt dealership.  Leal defendants claim, however, that Leal told Ehrler that he would only buy NY Metro if it was

---

[1] Leal defendants insist that this agreement was a "franchise agreement" and that NY Metro was a Peterbilt franchise.  Plaintiffs, however, deny that Peterbilt ever entered into a franchise agreement with Ehrler.

[2] Leal is currently the sole member of defendant Peterbilt of NYC.

delivered to him as a "turn-key operation" and if the sale price, lease terms, and financing made Leal's success viable. After the meeting, Peterbilt sent Leal a form APA to use as the basis for the formal contract with Ehrler.

On September 20, 2011, Ehrler sent a letter to Conroy expressing that he wished to "exit [their] relationship" and that if the transaction was not completed by October 3, 2011, the Flushing facility would cease operations on October 15, 2011 and the Hauppauge facility would cease operations on November 30, 2011. On September 21, 2011, Conroy sent a letter to Ehrler stating that Conroy intended to discuss the transaction with Leal. It also stated that Conroy was "uncertain as to the operating licenses and business licenses assigned to Hauppauge" and that "Peterbilt's Purchase due diligence [would] require confirmation of licenses and permits to operate the Hauppauge dealership as a full service location." Similarly, in a November 11, 2011 letter to Ehrler, Conroy noted that a basic term and condition of the Leal transaction was "[d]ocumented evidence of appropriate licenses and permits to operate a full service dealership." (Leal Defs.' Ex. G.) In that letter, Conroy also noted that Peterbilt would guarantee up to $100,000 of Leal's lease payments contingent on Ehrler's provision of the licenses and permits. Plaintiffs insist, however, that at the time of the November 11 letter they had provided all required certificates, licenses and other required documents. However, Peterbilt's letters to Ehrler of November 18, 2011 and November 23, 2011 repeated the same requirement as the November 11 letter regarding licenses and permits.

According to Leal defendants, Leal met Ehrler on November 29, 2011 and executed a "Purchase/Sale Agreement" (hereinafter "Purchase Agreement") for the sale of NY Metro. While plaintiffs argue that the Purchase Agreement contained all of the essential material terms necessary to bind the parties to a sale of NY Metro, Leal defendants contend that this document

4

was simply a letter of intent. The Purchase Agreement stated as follows:

> This agreement is between Barclay Ehrler, owner of New York Metro Peterbilt, and Mauricio Leal. Mr. Ehrler agrees to sell, and Mr. Leal agrees to purchase, the New York Metro Peterbilt dealership in Hauppauge, New York located at 18 Central Avenue according to the terms outlined in this agreement.

(Leal Defs.' Ex. J. ("the Purchase Agreement").) The Purchase Agreement provided that Leal would purchase the "accumulated goodwill of NY Metro" for $115,000 with $40,000 to be delivered to Ehrler upon the signing of the document and the balance due by December 31, 2011. It also provided that Leal would purchase all of the furniture and fixtures "at the lesser of net book value or fair market value, or at a price agreed upon with Mr. Ehrler," and noted that "[a] separate schedule of items to be purchased [would] be incorporated as an addendum to [the] agreement." Additionally, pursuant to the Purchase Agreement, Leal was to "purchase dealer business system, routers and all necessary hardware" for $15,000 and "all inventory currently on hand at the Hauppauge facility" for Ehrler's cost basis. The agreement also provided that Leal would rent the Hauppauge facility at a monthly rate of $35,000 for years 1 and 2, $36,750 for year 3, $38,588 for year 4, and $40,519 for year 5 with a $70,000 security deposit plus the first month's rent due upon signing of the Purchase Agreement and all other rental payments due on the first of the month. Finally, Leal hand wrote on the bottom of the Purchase Agreement "Business licenses and permits required" and "Environmental Phase I is required as minimum." Both parties agree that on November 29, 2011, Leal paid Ehrler $40,000.

Leal claims that after the agreement was signed, he attempted to move forward and work out a formal contract for purchase of the dealership, including customer lists, dealer operations, and a lease for the Hauppauge location. Leal also claims that he sent Ehrler two

drafts of the APA in December of 2011 and that Ehrler rejected them both. On January 25, Ehrler, through his attorney Donald LaGrega, tendered to Leal a proposed contract. Leal defendants maintain, however, that that contract did not contain any of the terms the parties needed to cover or any of the terms required by Peterbilt. Leal notified Ehrler by letter dated January 26, 2012, that the proposed contract was insufficient. Leal's letter also stated that prior to his takeover of the Hauppauge location, the parties would need to sign the APA and Ehrler would have to show Leal the certificate of occupancy for the building. According to Leal, Ehrler failed to provide that certificate.

On January 31, Leal met with Ehrler at the Hauppauge location. Leal claims that he informed Ehrler that there was no deal to close because Ehrler did not have the consideration required to close, i.e., the permits and licenses, but plaintiffs state that they were ready and willing to close on that date. Both parties agree that no deal occurred on that date, and by letter dated February 17, 2012, Leal requested reimbursement of his $40,000 deposit. Leal claims that Ehrler refunded Leal $38,000, keeping $2,000 for legal fees.

### DISCUSSION

### I.    Applicable Law and Legal Standards

Summary judgment pursuant to Rule 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.

Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts*," Aslanidis v. U.S. Lines, Inc*., 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an

essential element of the non-movant's claim. *Id*. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not implausible." *Id*. at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.      *Leal Defendants' Motion for Summary Judgment*

### A.      **Plaintiffs' Breach of Contract Claim**

Plaintiffs claim that Leal defendants breached the Purchase Agreement in failing to pay plaintiffs the sums outlined in the agreement. To establish a breach of contract claim in New York, a plaintiff must show: "(1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). Leal defendants argue that "Plaintiffs' claim for breach of contract must fail because Plaintiffs [cannot] satisfy even the first element of their breach of contract claim because no contract exists between the parties." (Leal Defs.' Mem. in Supp. at 11.)

While plaintiffs maintain that the Purchase Agreement is a "clear and unambiguous contract" containing "all of the material terms necessary to determine the intent of the parties," (Pls.' Mem. in Opp'n at 13-14), Leal defendants argue that the Purchase Agreement is a non-binding preliminary agreement. "Parties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements. When they do so and the parties fail to execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree." *Adjustrite Sys., Inc. v. GAB Business Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998). "Ordinarily, where the parties contemplate further negotiations and the execution of a formal

instrument, a preliminary agreement does not create a binding contract." *Id.* at 548. In some instances, however, "preliminary agreements can create binding obligations." *Id.* "Preliminary contracts with binding force can be of at least two distinct types." *Teachers Ins. and Annuity Ass'n of Amer. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987). "One occurs when the parties have reached complete agreement (including the agreement to be bound) on all issues perceived to require negotiation." *Id.* "The second . . . is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Id.* Through this second type of agreement, "the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." *Id.* Unlike the first type, which "binds both sides to their ultimate contractual objective in recognition that that contract has been reached," the second type "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *Id.* Here, plaintiffs' Complaint contains only a claim that Leal was bound by the terms of the Purchase Agreement and not any claims that Leal was obligated to negotiate any open terms in good faith. Therefore, the Court's analysis is limited to determining whether the parties executed the first type of agreement and were bound by its terms.

"The key [to determining whether an agreement is binding] is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Adjustrite*, 145 F.3d at 548-49. The Second Circuit has identified four factors that should be used in determining whether the parties to a preliminary agreement intended to be fully bound by that agreement:

"(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id*. at 549 (quoting *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)). Moreover, "[w]here 'a question of [the parties' intent to be bound] is determinable by written agreements, the question is one of law, appropriately decided . . . on a motion for summary judgment.' " *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) (quoting *Mallad Constr. Corp. v. Cnty. Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291 (1973)).

"The first factor, the language of the agreement, is 'the most important.' " *Arcadian*, 884 F.2d at 72. "[I]f the language of the agreement is clear that the parties did not intend to be bound, the [c]ourt need look no further." *Cohen v. Lehman Bros. Bank, FSB*, 273 F. Supp. 2d 524, 528 (S.D.N.Y. 2003). Regarding this factor, Leal defendants argue that the language in the first paragraph stating that the purchase and sale were to take place "according to the terms outlined" in the agreement indicates that the Purchase Agreement was purely an outline and not a binding contract. (Leal Defs.' Ex. J.) However, the Court cannot ignore that the document is titled a "Purchase/Sale Agreement," and unlike the agreements at issue in cases where courts have found preliminary agreements to be non-binding, "[i]t [does] not [include language indicating it is] a proposal, a draft, an expression of desires, or a memorandum of understanding." *Vacold LLC v. Cerami*, 545 F.3d 114,125 (2d Cir. 2008) (collecting cases). For example, in *Adjustrite Systems, Inc. v. Gab Business Services, Inc.*, the court found that the document in question was non-binding as it was entitled a "proposal" and set forth only defendant's "desire" to purchase assets. 145 F.3d at 549. Similarly, the court in *Arcadian*

*Phosphates, Inc. v. Arcadian Corp.*, found that the document in question was non-binding because although it was labeled an "agreement," it expressly referenced "the possibility that negotiations might fail and . . . a binding sales agreement to be completed at some future date." 884 F.2d at 72. Here, the document at issue does not contain any language indicating that it is a proposal and it does not reference a future binding agreement. Moreover, the agreement here is unlike that in *Brown v. Cara*, where the document "purport[ed] to 'outline the terms under which [the parties] [would] *work together*' " to achieve certain goals. 420 F.3d 148, 154 (2d Cir. 2005). Here, there is no such "decidedly non-committal" language indicating that the parties would work together to finalize the terms. *Id*.

On the other hand, the fact that the Purchase Agreement purports to "outline" the terms of the agreement and lacks detail regarding the terms indicates that the parties did not intend to be bound. For example, the agreement "fails to specifically identify the precise 'furniture and fixtures' being sold" (Leal Defs.' Mem. in Supp. at 17) or the price of those items, and it states that "[a] separate schedule of items to be purchased will be incorporated as an addendum" but does not include the schedule. Moreover, the document states that "inventory will be itemized" and "will be purchased . . . at Mr. Ehrler's cost basis," but it does not contain any information regarding the amount of inventory or the specific price. Moreover, although the agreement contained the amount of rent due on the Hauppauge location for the following five years, it indicated that the parties still needed to execute a formal lease. Additionally, Leal's handwritten additions of two terms at the bottom of the contract, "Environmental Phase I is required" and "Business license and permits required" seem to require further fleshing out. The lack of specificity of these terms indicates that the parties did not intend for it to be binding. *See Adjustrite* 145 F.3d at 550 (finding that contract was not binding where "although

11

the Agreement provided for the purchase of the [plaintiff's] license, the Agreement provided

no details concerning the contemplated transfer"). As a result, while the title of the Purchase

Agreement indicates an intent to be bound, the non-specificity of the terms indicates that the

parties did not intend it to be a binding agreement. Therefore, "[s]ince in this case intent

[cannot] readily be determined by examining the [Purchase Agreement], summary judgment [is

not] appropriate" and the dispute must be presented to a trier of fact. *Arcadian*, 884 F.2d at

73.[3] As a result, the Court will not dismiss plaintiffs' breach of contract claim.[4]

**B.     Plaintiffs' Fraud Claim**

Plaintiffs claim that Leal defendants committed fraud because they "agreed to purchase

plaintiffs' business . . . without the intent of consummating the transaction." (Compl. ¶ 27.) Leal

defendants argue that this claim "must be dismissed because it is duplicative of Plaintiff's breach

of contract claim." (Leal Defs.' Mem. in Supp. at 24.) "[U]nder New York law, 'where a fraud

claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of

an allegation that defendant never intended to perform the precise promises spelled out in the

---

[3] The Court notes that there are questions of fact as to the other factors that also prevent a finding that the Purchase Agreement was non-binding as a matter of law. For example, regarding the second factor, the parties dispute whether Leal's payment of $40,000 to Ehrler on November 29, 2011 was in partial performance of the contract. While plaintiffs contend that this payment was in satisfaction of the Purchase Agreement's requirement that Leal pay Ehrler $40,000 for the accumulated goodwill of NY Metro, Leal defendants argue it was simply a sign that Leal "would continue to negotiate the terms of the agreement in good faith." (Leal Defs.' Mem. in Supp. at 19.)

[4] Leal defendants argue that "[i]f this Court finds that the [Purchase Agreement] is a binding and enforceable contract . . . the Leal Defendants are entitled to summary judgment dismissing Plaintiffs' Complaint in its entirety nonetheless because Plaintiffs failed to perform their duties and obligations under the alleged contract." (Leal Defs.' Mem. in Supp. at 22.) However, since at this stage the Court has not found that the agreement is binding, it will not reach Leal defendants' contention that plaintiffs breached the Purchase Agreement. The Court notes, however, that Leal defendants have not asserted any counterclaim for breach of contract in their answer.

contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.' " *Telecom. Int'l Amer., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quoting *Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994)). "In other words, 'simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim.' " *Id.* (quoting *Best Western Int'l, Inc. v. CSI Int'l Corp*, 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994)). To the extent plaintiffs contend that the fraud claim arises "not from the Purchase Agreement, but from misrepresentations extraneous to the contract" (Pls.' Mem. in Opp'n at 19), they do not specifically identify any of these statements nor point to any evidence suggesting that plaintiffs relied on these statements to their detriment. *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995) ("To prove common law fraud under New York law, a plaintiff must demonstrate that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of such reliance."). Therefore, plaintiffs' fraud claim is dismissed against the Leal defendants.

### III.    *Peterbilt's Motion for Summary Judgment*

### A.    **Breach of Contract**

Plaintiffs claim that although Peterbilt was not a party to the Purchase Agreement, it is liable for Leal's failure to pay the consideration provided for in the Purchase Agreement under an agency theory. Under New York law, "[a]gency is the relationship that results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control, and consent by the other so to act." *G.D. Searle &*

*Co. v. Medicore Commc'ns, Inc.*, 843 F. Supp. 895, 904 (S.D.N.Y. 1994). "One of the primary characteristics of agency is that the agent is placed in a position whereby he may affect or alter the legal relations between the principal and third persons." *Id.*; *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575 (2d Cir. 2010) ("A principal's ability to exercise control over its agent is an essential element of agency.").

It is well established that "a principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir. 1989). "Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly." *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010). "Where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." *Id.* at 328. Accordingly, "[a]pparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997) (internal quotation marks and citations omitted). "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into the transaction." *Wells Fargo Home Mortg., Inc. v. Hiddekel Church of God, Inc.*, 2004 WL 258144, at *6 (Sup. Ct. 2004) (internal quotation marks and citations omitted).

Although plaintiffs acknowledge that Peterbilt was not a party to the Purchase

14

Agreement, plaintiffs contend that Peterbilt "controlled every aspect of [the] transaction," (Pls.' Mem. in Opp'n at 15), and draw the Court's attention to the communications between Ehrler and Conroy exchanged prior to execution of the Purchase Agreement (*Id*. at 17). In one of these communications dated September 21, 2011 (Pls.' Ex. A to Opp'n to Peterbilt's Mot. for Summ. J.), Conroy wrote that he would be meeting with Leal concerning the sale of NY Metro. Conroy also stated "[a]s we review this opportunity it is our preference is [sic] to operate the dealership from the Hauppauge location only." He also said that he was "optimistic we can agree in concept on the purchase of appropriate and necessary assets," but noted that "[o]ur purchase due diligence will require confirmation of licenses and permits to operate the Hauppauge dealership as a full service location." Although these statements do not directly reference Peterbilt's grant of authority to Leal to engage in the dealership transaction on its behalf, a reasonable trier of fact could find that this letter raises a question as to whether Leal acted with apparent authority. A reasonable factfinder could find that Conroy's discussion of his intent to meet with Leal regarding the transaction as well as his use of the words "we" and "our" gave rise to the appearance that Peterbilt had authorized Leal to act on its behalf. As a result, plaintiff's breach of contract claim against Peterbilt is not dismissed.

### B.     Misrepresentation

Count II of the complaint alleges that Peterbilt made fraudulent misrepresentations to plaintiffs regarding the purchase of NY Metro. Specifically, plaintiffs allege that they "agreed to the extension of the dealership agreement based upon defendant [Peterbilt's] representations to plaintiffs that defendant [Peterbilt] would purchase the dealership and rent plaintiff's premises for a fair and reasonable price." (Compl. ¶ 18.) Moreover, plaintiffs claim that "had it not been for [Peterbilt's] representations to plaintiffs, plaintiffs would have marketed the

15

business to third parties who, upon information and belief, were interested in purchasing the business." (*Id.* ¶ 19.)

A claim of fraudulent misrepresentation under New York law requires proof that: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement*, 57 F.3d at 153.

Peterbilt argues that plaintiffs have not raised any evidence that Peterbilt made material false statements. Plaintiffs claim, however, that "Peterbilt made numerous misrepresentations throughout the negotiation process," including "the fact that it would, through its agent and employee Leal, purchase NY Metro Peterbilt's business at the price set forth in the Purchase Agreement." (Pls.' Mem. in Opp'n at 19.) Once again, the plaintiffs draw the Court's attention to the communications between Conroy and Ehrler, although they do not specify the ones they claim contain material false statements. To the extent plaintiffs rely on the September 21, 2011 letter from Conroy referenced above expressing Peterbilt's desire to consummate the sale of NY Metro, plaintiffs have not raised any question as to whether these statements were false at the time they were made. Such is also the case regarding the November 2011 letters from Conroy expressing Peterbilt's desire to move forward with the sale of NY Metro to Leal pending Ehrler's agreement to certain terms. (*See* Exs. C-7, C-8, C-9 to Peterbilt's Mem. in Sup.) As a result, plaintiffs have failed to raise a genuine dispute as to an essential element of their misrepresentation claim against Peterbilt and that claim is dismissed.

### C. Price Discrimination

In Count III of the Complaint, plaintiffs allege that Peterbilt "agreed that it would sell trucks and parts inventory to plaintiffs at a price equal to the price [Peterbilt] sold its trucks and parts to other dealerships," but Peterbilt "breached its agreement . . . in order to render it impossible for plaintiffs to sell [Peterbilt's] products at a price which was competitive with the prices which competing dealerships could offer potential product purchasers." (Compl. ¶¶ 24-25.) Peterbilt argues that there is no language in the dealer agreement requiring such sales and that even if there was, plaintiffs have not presented any evidence of a breach. Additionally, Peterbilt points out that Ehrler testified at his deposition that he was not aware what other dealers paid for trucks from Peterbilt and that he did not have any evidence that Peterbilt was selling trucks to other dealers at lower prices than the trucks sold to plaintiffs. (Ehrler Dep. at 115, 118, 122.) Plaintiffs have not responded to this argument nor pointed to any evidence to the contrary. As a result, this claim is dismissed.

## IV.   *Plaintiffs' Motion for Summary Judgment on Leal Defendants' Counterclaims*

As an initial matter, "the Leal Defendants waive their Third, Sixth and Seventh Affirmative Defenses," so the Court need not address plaintiff's motion to dismiss these defenses. (Leal Aff. in Opp'n to Pls.' Mot. for Summ. J. ("Leal Aff.") ¶ 3.) "Therefore, the only issue before this Court on Plaintiffs' motion for summary judgment is whether Plaintiffs have demonstrated that there are no genuine issues of fact and that they are entitled to judgment as a matter of law thereby warranting a dismissal of the Leal Defendants' Counterclaims." (*Id.* ¶ 4.)

### A.   Breach of the Dealership Agreement

Leal defendants claim that plaintiffs "knowingly and wrongfully continued to hold themselves out as a Peterbilt dealer – after termination/cancellation of their franchise on January 31, 2012 – by continuing to perform Peterbilt warranty work, selling and servicing

Peterbilt trucks." (Leal Defs.' Mem. in Opp'n at 9.) According to Leal defendants, these

actions were in breach of plaintiffs' cancellation/termination policy contained in the Dealership

Agreement with Peterbilt and resulted in damages to Leal defendants as third party

beneficiaries of that agreement. (*Id.*) Moreover, Leal defendants claim that this behavior

resulted in plaintiffs' "interference with the Defendants' franchise[5] in the amount of

$3,000,000"(Answer ¶ 101), though they do not explain the basis for this claim.

According to plaintiffs, Leal defendants "have no basis to assert any breach of the NY

Metro Peterbilt Dealership Agreement" because "Defendants were not parties to the agreement

and have been assigned no rights under the agreement." (Pls.' Mem. in Supp. at 9.) Plaintiffs

point out that "the [dealership] agreement indicates no intent to benefit Defendants." (Pls.'

Reply at 4.) In their Memorandum in Opposition, Leal defendants have not responded by

raising any genuine issue of fact as to their claim that they are third party beneficiaries of that

agreement. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336 (1983)

(stating that third party beneficiary may recover only by establishing *inter alia*, that the

contract was intended for his benefit and that the benefit "is sufficiently immediate, rather than

incidental"). Nor have they explained how they sustained damages as a result of the alleged

breach. As a result, this counterclaim is dismissed.

### B.     Fraudulent Misrepresentation

Leal defendants allege that "misrepresentations of Plaintiff as to business licenses,

certificates of occupancy, [and] environmental hazards were intended to deceive and fraud"

defendant Leal. (Answer ¶ 109.) As noted above, in order to succeed on a fraudulent

---

[5] The Court notes that Leal defendants' position is perplexing given that in their motion
for summary judgment (discussed at Part II) they argued that the Purchase Agreement through
which they were to acquire the "franchise" was not binding.

misrepresentation claim in New York, the claimant must prove that: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement,* 57 F.3d at 153.

Leal defendants claim that plaintiffs made various misrepresentations. First, they claim that "Plaintiffs directed Leal Defendants to business financial statements which Plaintiffs knew showed a substantial profit," but "business income tax returns, obtained from Plaintiffs by Court order during discovery, showed the business had in fact sustained substantial losses." (Leal Defs.' Mem. in Opp'n at 10-12.) Second, they claim that "Plaintiffs represented the business as environmentally clean, but . . . refused to give Leal Defendants a Phase I [environmental] report" that "reflected an underground tank on the premises." (*Id*.) Finally, they claim that plaintiffs represented that they had business permits "required to legally operate the dealership," when in actuality they "did not have the certificate of occupancy and other business permits" until six months after they "had tried to force a closing without them." (*Id*.) Moreover, Leal defendants claim that "[i]t is reasonable to conclude that . . . the Plaintiffs['] representations as to the financial statements, clean environmentals, and existence of needed business permits, induced Leal Defendants to continue to pursue the purchase, and Leal Defendants' reliance on the representations was reasonable in the circumstances." (*Id*. at 11.) Additionally, they claim that "Plaintiffs continued to undertake acts pursuant to the purported sale requiring [them] to expend money, time, and forgo opportunities." (*Id*.) Leal Defendants claim that Leal "expended an excess of $50,000.00 in pursuing of the [Purchase Agreement]" (Answer ¶ 110) and also assert that they have been damaged in the amount of $1,000,000 (*Id*. ¶114). Leal defendants, however, fail to cite any evidence to support this cause of action,

particularly that plaintiffs intentionally made false representations and that they sustained damages in the alleged amount as a result. Accordingly, they have not raised a genuine question of fact regarding plaintiffs' alleged misrepresentations, and this claim is dismissed.

### C.    Bad Faith

Related to the misrepresentation claim, Leal defendants claim that plaintiffs acted in bad faith because "during the period in which Plaintiffs were seeking to sell and Leal Defendants [were] seeking to buy Plaintiffs' franchise, Plaintiffs did not deliver any item promised, that plaintiffs misrepresented facts, concealed conditions, refused to act to carryout [sic] known requirements in furtherance of obtaining franchisor approval of the business sale including but not limited to execution of a formal contract," but like the misrepresentation claim discussed previously, they fail to cite any relevant evidence to support the bad faith claim. (Leal Defs.' Mem. in Opp'n at 12.) Nor do Leal defendants cite any legal authority to support this cause of action. As a result, Leal defendants' bad faith claim is similarly dismissed.

Furthermore, Leal defendants claim that since "Plaintiffs knowingly [brought] suit against [them] under these circumstances" of "omissions" and "fraud," the Court should find that plaintiffs' lawsuit was frivolous. (*Id*. at 13.) However, since the Court has dismissed Leal defendants' counterclaims that were based on these "circumstances" of fraud, the frivolous lawsuit claim is also dismissed. Moreover, the Court also dismisses Leal defendants' claim for attorneys' fees, which it claims "[arose] out of [its] fraud claims." (*Id*.)

### CONCLUSION

For the foregoing reasons, Leal defendants' motion for summary judgment is granted in part and denied in part, defendant Peterbilt's motion for summary judgment is granted in

part and denied in part, and plaintiffs' motion for summary judgment is granted.  The case

is returned to Magistrate Judge Brown for all remaining pre-trial supervision

**SO ORDERED.**

Dated: Central Islip, New York
      March 30, 2015

                                          _____/s/_____
                                          Denis R. Hurley
                                          United States District Judge